HOMES CONSULTANT COMPANY, INC., Appellant-Appellee,
*v.* JOSHUA C. AGSALUD, Director of the Department of Labor
and Industrial Relations, State of Hawaii, Appellee-Appellant

NO. 7273

CIVIL NO. 54421

SEPTEMBER 15, 1981

HAYASHI, C.J., PADGETT AND BURNS, JJ.

OPINION OF THE COURT BY HAYASHI, C.J.

Joshua C. Agsalud, Director of the Department of Labor and Industrial Relations, State of Hawaii (Director), appeals from the decision and order entered by the circuit court which reversed the decision of the referee for the unemployment compensation appeals board, Department of Labor and Industrial Relations, State of Hawaii (Appeals Board). The referee held that the salespersons for

Homes Consultant Company, Inc. (Homes), who had been paid commissions, were covered by the Hawaii employment security law (Chapter 383, Hawaii Revised Statutes).

The issues are: (1) whether the circuit court erred in reversing the referee's determination that salespersons representing Homes were "employees" under the control and supervision of Homes for the purposes of employment security taxation, in the absence of a showing that such finding was clearly erroneous; and (2) whether the circuit court's affirmation of the referee's determination that the salespersons representing Homes were "customarily engaged in an independently established trade" within the meaning of Hawaii Revised Statutes (HRS) § 383-6(3) (1976) was clearly erroneous in light of the evidence presented.

Homes is engaged in the business of home remodeling and sells and installs steel and fiberglass siding for homeowners. Its office and warehouse is at 46-022 Alaloa Street in Kaneohe. Salespersons were recruited by newspaper ads and through referrals from other building trades associates and went door to door throughout the community soliciting customers for Homes' products. Homes supplied the salespersons with sales literature and sample kits provided by the manufacturer of the products used by Homes. The contract forms bearing the name "Homes Consultants" were also supplied to the salespersons by Homes. The salespersons were not required to work specific hours, nor were they required to submit sales reports or other documentation evidencing their daily activities. No records were maintained by Homes as to the specific identity and number of salespersons representing Homes. They were not required to attend sales meetings and Homes offered little or no training, relying instead on the salesperson's natural abilities to use his acquired skills to effect sales. The salespersons were paid either by commission or on a "par sales" basis[1] and the terms of payment were established prior to the salesperson's receipt of the sales kit and the proposed contract forms. Salespersons could negotiate price with the customer within the limits established by Homes. Upon effecting a "sale," the salesperson returned to the Homes offices and submitted

---

[1] On a "par sales" basis, the salesperson retains the amount over and above Homes' cost and profit based on a special formula. Homes makes the final determination as to the method of payment to be utilized prior to salesperson's performance.

the proposed contract for approval. The contract terms stipulated that the contract was not binding unless and until it was approved by Homes. Upon approval, a sales manager, employed by Homes, was dispatched to the customer to insure that Homes could comply with the salesperson's representations and to verify measurements submitted by the salesperson. Upon completion of the job, the salesperson returned to the customer to deliver the manufacturer's warranty. Homes kept records of the amounts paid to the various salespersons as commissions.

In October 1977 the Unemployment Insurance Division of the Department of Labor and Industrial Relations notified Homes that it owed $3,939.48 in unemployment insurance contributions based upon its determination that Homes' salespersons were "employees" and that the commissions paid to them were covered by the Hawaii employment security law under HRS Chapter 383. Homes paid the assessment but appealed the determination to the Appeals Board.

Under the Hawaii employment security law, unemployment compensation contributions are payable on wages paid with respect to employment. Wages are defined as remuneration from whatever source, including commission and bonuses.[2] Employment is defined as services performed for wages under any contract of hire, written or oral, express or implied.[3] Under HRS § 383-6 (1976), individuals who receive wages are presumed to be in employment. This presumption can be overcome by Homes' satisfying the requirements under HRS §§ 383-6(1) (1976), 383-6(2) (1976), and 383-6(3) (1976).

HRS §§ 383-6(1) (1976), 383-6(2) (1976), and 383-6(3) (1976) provide:

> § 383-6 *Master and servant relationship, not required when.* Services performed by an individual for wages or under any contract of hire shall be deemed to be employment subject to this chapter irrespective of whether the common law relationship of master and servant exists unless and until it is shown to the satisfaction of the department of labor and industrial relations that:
>
> > (1) The individual has been and will continue to be free

---

[2] *See* HRS § 383-10 (1976).

[3] *See* HRS § 383-2 (1976, as amended).

from control or direction over the performance of such service, both under his contract of hire and in fact; and

   (2) The service is either outside the usual course of the business for which the service is performed or that the service is performed outside of all the places of business of the enterprise for which the service is performed; and

   (3) The individual is customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the contract of service.

In order to prevail at the hearing before the Appeals Board, therefore, Homes bore the burden of satisfying all three requirements in the above quoted statute. *In Re Century Metalcraft*, 41 Haw. 508 (1957). The *only* testimony given at the hearing was that of Anthony Piligrino, the president of Homes. No salespersons were called to testify, nor were any other employees of Homes called.

The Appeals Board referee found that Homes had satisfied requirements (2) and (3) of the statute but had failed to satisfy requirement (1) on the question of control. Accordingly, since Homes had failed to meet all three requirements, the referee upheld the assessment, and Homes appealed to the circuit court. The circuit judge ruled that all three requirements had been met and reversed the assessment. The Director has appealed that ruling.

The circuit court's review of decisions by administrative agencies is governed by HRS § 91-14(g) (1976).

   (g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

      (1) In violation of constitutional or statutory provisions; or

      (2) In excess of the statutory authority or jurisdiction of the agency; or

      (3) Made upon unlawful procedure; or

      (4) Affected by other error of law; or

      (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Our review of the circuit court's review of decisions by administrative agencies is governed by HRS § 91-15 (1976), and through it by Hawaii Rules of Civil Procedure (HRCP) Rule 52(a).[4]

In this appeal, the Director's contention is that the circuit court's reversal of the referee's finding that the salespersons were subject to control by Homes is "clearly erroneous" under HRS § 91-14(g)(5).[5] Under the "clearly erroneous" standard a reviewing court cannot reverse an agency's findings unless it is left with a definite and firm conviction that a mistake has been made in view of the reliable, probative, and substantial evidence on the whole record. *In Re Kauai Electric Division of Citizens Utility Company*, 60 Haw. 166, 590 P.2d 524 (1978); *DeFries v. Association of Owners, 999 Wilder*, 57 Haw. 296, 555 P.2d 855 (1976); *DeVictoria v. H&K Contractors*, 56 Haw. 552, 545 P.2d 692 (1976); *Hamabata v. Hawaiian Insurance and Guaranty Co., Ltd.*, 1 Haw. App. 350, 619 P.2d 516 (1980).

Thus, the issue before us is whether the lower court clearly erred when it decided that the Appeals Board referee clearly erred. We answer in the affirmative.

On the question of control, our supreme court has stated that in order to satisfy the requirement of HRS § 383-6(1) (1976),

[T]he control reserved to the principal for unemployment compensation purposes need not extend to all the details of the

---

[4] HRCP Rule 52(a) provides:

*Effect.* In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Request for findings are not necessary for purposes of review. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56 or any other motion except as provided in Rule 41(b).

[5] We must assume that this is the Director's position because the opening brief does not raise any other allegation of error that would fall within the criteria set forth at HRS § 91-14(g).

physical performance of the service by the worker that may be essential to the master-servant relationship but may be merely a general one exercisable, directly or indirectly, over the physical activities and time surrendered by the worker.

*Bailey's Bakery v. Tax Commissioner,* 38 Haw. 16, 50 (1948).

The Director argues that the mere fact that Homes did not exercise direct control of all the details of the salespersons' activities did not give rise to a finding that requirement (1) was met, citing *In Re Century Metalcraft, supra,* wherein the supreme court found that the "control" contemplated by HRS § 383-6(1) (1976) was "a general control and need not extend to all the details of the performance of service." The Director argues that while Homes appeared to have given up all control and direction over its salespersons, there remained sufficient indicia of control to support the referee's decision, to wit: (1) Homes had final approval on acceptance or rejection of proposed contracts; (2) Homes, while stating it didn't keep records on its salespersons, did maintain records of the whereabouts of its sales literature and sales kits and to whom payments were made; (3) despite the substantial leeway given the salespersons in setting prices, the activities were subject to review by the sales manager prior to the company's approval of the contract. We agree.

As for requirement (3), we think both the referee and the lower court clearly erred. To satisfy the requirements of this test, Homes bore the burden of establishing, by reliable, substantive and probative evidence, that the salespersons were "customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the contract of service." In our view, this requirement has not been met. At the hearing on the question, no evidence was presented that any salesperson was, in fact, an independent contractor who customarily was engaged in the business of representing home improvement contractors within the community. The only evidence, if it is such, is the decidedly self-serving hearsay testimony of the president of Homes that the unnamed salespersons routinely carried competitors' contracts.[6] Ac-

---

[6] At the hearing before the referee of the Appeals Board, the president of Homes described the salesmen as follows:

    MR. PILIGRINO:   In this industry, there are a lot of men who have been working in the so-called home improvement business for years, and they come to

cordingly, in light of the lack of evidentiary support for the finding, we are convinced that the referee and the circuit court clearly erred in their conclusion that Homes satisfied requirement (3). We affirm the ultimate conclusion of the Appeals Board that Homes should have been assessed the amounts due for purposes of employment security taxation.

Accordingly, the judgment of the circuit court is reversed and the decision of the Appeals Board is affirmed.

*Bruce C. Dinman (Law Offices of Bruce C. Dinman) (Susan Tamura Sato–Davis, Playdon & Gerson,* of counsel—on the briefs) for appellant-appellee Homes Consultant Co., Inc.

*Carol K. Yamamoto,* Deputy Attorney General, for appellee-appellant Department of Labor and Industrial Relations.

---

us. They're free lancers. We might use the word brokers. They solicit their own work. They're door pounders. They walk down one side of the street and knock on doors, soliciting the other side of the street knocking doors, soliciting work. They may carry in their suitcase as many as four or five different types of contracts. They may carry three or four contracts of the same material given to them by three or four different contractors. I've seen many cases in which, I sell steel siding. The same man I know that offered me some steel siding, because when we get into the house, he told a customer wanted steel siding, so he thought, "I can sell this customer steel siding," and he pulled out his steel siding brochures, his steel siding contract, Homes Consultant. Then he looks, in further discussions with the next door neighbor, he'll find that this customer likes vinyl instead, or aluminum, or masonite. So he conveniently pulls out the other contract by Joe's Vinyl Company down the street, and so he drops prices or plays with figures, where he convinces the customer, whatever the customer wants, he just coincidentally happens to have. The customer says, "Well, I'm thinking of expanding my lanai with vinyl." "We have that for you too," and he pulls out a contract by a guy who does room additions, which we do not.